SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

## ADS Associates Group, Inc. v. Oritani Savings Bank (A-114-11) (069987)

**Argued September 10, 2013; Reargued April 9, 2014 -- Decided September 30, 2014**

**PATTERSON, J., writing for a majority of the Court.**

In this appeal, the Court considers whether plaintiff is a bank "customer" who can bring a claim under Article 4A of the Uniform Commercial Code (UCC), N.J.S.A. 12A:4A-101 to -507, and, if not, whether plaintiff, as a non-bank customer, can assert a common law negligence claim against the bank.

Plaintiff Brendan Allen and defendant Asnel Diaz Sanchez engaged in a joint business venture to perform work on the Bergen-Hudson Light Rail project. Allen and Sanchez decided to operate the joint venture through Sanchez's company, ADS Associates, Inc. (ADS). On October 2, 2003, Allen and Sanchez went to Oritani Savings Bank (Oritani) and, with the assistance of Oritani employee Marlene Fabregas, opened a dual-signature account in the name of ADS. The account was separate from preexisting accounts that ADS had with Oritani and required both Allen's and Sanchez's signatures to transact business from the account. Using an Oritani form, Sanchez also issued a corporate resolution appointing Allen as Treasurer of ADS. The Bank's "Business Checking Account" Agreement (Account Agreement), which was signed by Allen and Sanchez, acting on behalf of ADS, and Fabregas, acting on behalf of Oritani, required ADS to "examine the [monthly statement issued by Oritani] and report any problem or error with an account statement within 60 days after the statement is sent to [ADS]." Failure to do so meant that Oritani would "not [be] liable for such problem or error." The Account Agreement further provided that ADS would be "liable for any losses or expenses caused by [ADS's] employees, owners, principals or agents who forge or alter any instrument or endorsement or make any unauthorized charge to [ADS's] account." Fabregas explained to Allen and Sanchez that only ADS, as the account holder, would receive bank statements, and that Oritani would not separately mail bank statements to Allen. Soon after ADS commenced work on the project, Sanchez, using Oritani's internet banking services, linked the dual-signature ADS account to other ADS accounts within his control. Thereafter, without Allen's knowledge, through a series of internet transactions, Sanchez transferred a substantial sum of money from the dual-signature ADS account that he had opened with Allen to his other ADS accounts.

After learning of Sanchez's transfers, Allen filed a lawsuit alleging, among other things, common law negligence and UCC violations against Oritani. The trial court dismissed Allen's individual claims against Oritani, but permitted Allen to file claims against Oritani on behalf of ADS. Following the close of all evidence but before the case was submitted to the jury, the court considered motions to dismiss filed pursuant to Rules 4:37-2(b) and 4:40-1, and dismissed all the claims that Allen brought on ADS's behalf except for a UCC Article 4A claim. In dismissing the negligence claim, the trial court reasoned that "because the internet transfers are covered by Article 4A any negligence or gross negligence claim based upon them is preempted by Article 4A." The jury subsequently returned a verdict in ADS's favor on the sole remaining Article 4A claim. The trial court, however, entered a judgment notwithstanding the verdict in favor of Oritani premised on the indemnification provision in the Account Agreement. On appeal, the Appellate Division determined that Allen could not pursue claims on behalf of ADS based on a resolution issued by Sanchez denying Allen that authority. The panel held, however, that Allen could pursue common law claims on his own behalf against Oritani based on his "special relationship" with Oritani pursuant to City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 60-65 (2001). The panel therefore reversed the trial court's order dismissing Allen's individual common law negligence claim and remanded for a new trial. The Court granted limited certification. 210 N.J. 260 (2012).

1

**HELD**: Allen may not assert a UCC Article 4A claim against Oritani because he is not a bank "customer" under the statute. Allen also may not assert a common law negligence claim against Oritani because such a claim would contravene the objectives of Article 4A. Even if Article 4A did not bar Allen's negligence claim, no "special relationship" existed to create a duty of care between Oritani and Allen under City Check Cashing, 166 N.J. 49.

1. Article 4A of the UCC was enacted in 1994 to address electronic funds transfers. Article 4A provides the statutory framework that governs the transactions at issue in this case because Sanchez's internet transfers from the dual-signature ADS account to his other ADS accounts were "funds transfers" within the meaning of Article 4A. See N.J.S.A. 12A:4A-104(1). Article 4A defines in detail the rights and obligations of banks and their customers concerning non-authorized funds transfers. Throughout the statutory provisions and their official comments, the word "customer" is used to describe the person or entity entitled to pursue a remedy against a bank if the statutory requirements for a cause of action are met. The term "customer" is defined as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." N.J.S.A. 12A:4A-105(1)(c). The record here demonstrates that ADS, and not Allen, was Oritani's "customer." ADS, not Allen, executed the Account Agreement, was the account holder, and was entitled to receive bank statements and to report account errors. The record contains no evidence that Oritani ever agreed to receive a payment order from Allen or acted in a manner that could have induced Allen to believe that he was its "customer." Therefore, because Allen was not Oritani's "customer," he cannot pursue a claim against the bank under UCC Article 4A. (pp. 18-26)

2. Notwithstanding its expansive language, "the UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction." N.J. Bank, N.A. v. Bradford Sec. Operations, Inc., 690 F.2d 339, 345 (3d Cir. 1982). In City Check Cashing, this Court considered whether a check-cashing service that was not the customer of the defendant bank could assert a common law cause of action against the bank. 166 N.J. at 52-55. The Court held that "in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC]." Id. at 62. In Brunson v. Affinity Federal Credit Union, the Court underscored its holding in City Check Cashing, noting that "in the unique context of whether a bank owes a duty to a non-customer, it is clear that '[a]bsent a special relationship, courts will typically bar claims of non-customers against banks.'" 199 N.J. 381, 400 (2009) (alteration in original) (quoting City Check Cashing, 166 N.J. at 60). (pp. 26-30)

3. In that analytical framework, the Court considers whether a claim by Allen against Oritani premised upon common law negligence would contravene the provisions of UCC Article 4A. The official comments to UCC Article 4A make clear that it was enacted to comprehensively define the rights and remedies of parties affected by the funds transfers governed by the statute's terms. See N.J.S.A. 12A:4A-102 cmt. 1. The dispute in this case arises from a setting directly addressed by Article 4A -- a bank's acceptance of an order transferring funds from one account held by its customer to another of that customer's accounts. Consequently, this matter is among the disputes for which the Legislature intended Article 4A to constitute "the exclusive means of determining the rights, duties and liabilities of the affected parties." Ibid. If Allen were permitted to assert a negligence claim against Oritani, the "careful and delicate balancing" of competing interests that generated Article 4A would be undermined. Ibid. Therefore, a decision authorizing Allen to assert a negligence claim in this case, in which he clearly lacks the status of a customer, would contravene the purpose and the terms of Article 4A. (pp. 30-36)

4. Even if Article 4A's language and intent did not bar a negligence claim, no duty of care premised upon a "special relationship," as contemplated in City Check Cashing, could be found in the circumstances of this case. The duty of care recognized in City Check Cashing must be premised on a special relationship derived from the parties' "agreement, undertaking or contact." 166 N.J. at 62. None of those sources of a special relationship can be found in this case. Oritani had no direct agreement with, or undertaking for the benefit of, Allen as an individual. The Account Agreement and the statements of Oritani's representative made clear that its duties were to ADS and that Allen was not individually Oritani's customer. There was also no contact between Allen and Oritani that would support a special relationship. In City Check Cashing, the Court characterized "contact," comparing it to agreements and undertakings, as "the loosest of the three terms, defined as the 'establishment of communication with someone.'" Id. at 62 (quoting Webster's Ninth New Collegiate Dictionary 282 (9th ed. 1984)). Allen's

2

"contact" with Oritani was limited to two visits:  The October 2, 2003, meeting to open the dual-signature ADS account with Sanchez, and a visit to the bank after Allen learned of Sanchez's transfers.  The record reveals no contact at all between Allen and Oritani during the period in which Sanchez conducted the disputed transfers, much less a communication that would have alerted Oritani to monitor ADS's account activity.  (pp. 36-40)

The judgment of the Appellate Division is **REVERSED**, and the judgment of the trial court is **REINSTATED**.

**JUSTICE ALBIN, DISSENTING**, expresses the view that Allen was a bank customer for UCC purposes and his common-law negligence claim pursuant to City Check Cashing was not inconsistent with the UCC; therefore, he should have been permitted to proceed on both claims.

**CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and FERNANDEZ-VINA, and JUDGES RODRÍGUEZ and CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion.**

ADS ASSOCIATES GROUP, INC.,
and BRENDAN ALLEN,

     Plaintiffs-Respondents,

        v.

ORITANI SAVINGS BANK,

     Defendant-Appellant,

        and

ASNEL DIAZ SANCHEZ,

     Defendant.


        Argued September 10, 2013
        Reargued April 9, 2014 – Decided September 30, 2014

        On certification to the Superior Court,
        Appellate Division.

        Gregg S. Sodini argued the cause for
        appellant.

        Gary S. Newman argued the cause for
        respondents (Newman & Denburg, attorneys).

    JUSTICE PATTERSON delivered the opinion of the Court.

In this appeal, the Court considers whether an individual who is not the customer of a bank can assert a common law negligence claim, premised upon the bank's allegedly improper handling of a corporation's funds transfers.

This case arose from a business venture that was established by plaintiff Brendan Allen (Allen) and defendant Asnel Diaz Sanchez (Sanchez). The venture was operated through plaintiff ADS Associates, Inc. (ADS), a corporation fully owned by Sanchez. Allen and Sanchez opened a business checking account in the name of ADS at a branch of Oritani Savings Bank (Oritani), where ADS had preexisting accounts. By agreement between ADS and Oritani, the new ADS account required the signatures of both Allen, who served as ADS's Treasurer, and Sanchez to appear on each check drawn on the account. Despite that limitation, Sanchez linked the new ADS account to other ADS accounts within his control and, through a series of internet transactions, transferred a substantial sum of money from the ADS account he had established with Allen to his other ADS accounts.

After learning of these transfers, Allen sued Oritani and Sanchez. Although it dismissed Allen's claims, the trial court permitted Allen to assert claims on ADS's behalf against Oritani, notwithstanding Sanchez's issuance of a resolution denying Allen the authority to maintain an action on ADS's behalf. A jury returned a verdict in favor of ADS. The trial court, however, entered a judgment notwithstanding the verdict in favor of Oritani premised on an indemnification provision in the agreement governing ADS's account with Oritani.

2

An Appellate Division panel reversed the trial court's determination. It found that the ADS resolution signed by Sanchez deprived Allen of authority to assert a claim on behalf of ADS. The panel held, however, that Allen could assert a common law negligence claim against Oritani despite the fact that he was not Oritani's banking customer. It concluded that, by virtue of their prior communications, Allen had a "special relationship" with Oritani, pursuant to this Court's holding in City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 60-65 (2001), and that Oritani had a duty to advise Allen of its internet banking policies when he and Sanchez opened the ADS account.

We concur with the trial court that Article 4A of the Uniform Commercial Code (UCC), N.J.S.A. 12A:4A-101 to -507, governs the wire transfers at the center of this case, and that Allen may not assert a claim under Article 4A against Oritani because he does not meet the statutory definition of a bank "customer." N.J.S.A. 12A:4A-105(1)(c). We further hold that Allen may not assert a negligence claim based upon an alleged special relationship with Oritani under City Check Cashing, supra, 166 N.J. at 59-62. The Legislature enacted Article 4A to comprehensively address the issues raised by funds transfers and to determine the rights, duties, and liabilities of the parties affected by such transactions. Allowing Allen's common law

3

negligence claim to proceed would undermine the statute's objectives.

Accordingly, we reverse the determination of the Appellate Division, and reinstate the judgment of the trial court.

I.

We derive our account of the facts from the trial testimony and documents admitted into evidence before the trial court.

In August 2003, Allen approached Sanchez regarding a potential business venture involving the removal of a dirt stockpile from a construction site for the Bergen-Hudson Light Rail project. When Allen learned of the Bergen-Hudson Light Rail project, he was interested in bidding on it, but concluded that to proceed with the venture he would need to operate through a corporate entity with a union contract and minority-owned business status. Consequently, Allen approached Sanchez, who was already the sole shareholder, officer, and director of ADS, a New Jersey corporation established in September 2001.[1]

Allen and Sanchez agreed to jointly bid on the project and perform the work should their bid be successful. According to Allen, Sanchez undertook the tasks of billing, preparing invoices, processing all paperwork, managing the checkbook, and reviewing bank statements. Further, Sanchez testified that he

---

[1] "ADS" stands for Asnel Diaz Sanchez.

4

and Allen agreed that ADS would assume liability related to the work. Allen and Sanchez agreed that after all expenses related to the venture were paid, Allen would receive seventy percent of the profits and Sanchez would receive thirty percent.[2]

ADS was the successful bidder on the project and was awarded the Bergen-Hudson Light Rail contract. With the work about to commence, Allen and Sanchez agreed to open a bank account at Oritani, at which ADS already held accounts. According to Allen, the account was to be opened in ADS's name because of ADS's status as an established minority-owned business.

On October 2, 2003, Allen and Sanchez visited Oritani to open the account. They met with Marlene Fabregas, a representative of the bank. Allen testified that he and Sanchez explained to Fabregas that they wanted to open an account separate from ADS's preexisting accounts in order to cooperatively control funds relating to what they termed their "joint venture." According to Allen, he and Sanchez advised Fabregas that they wanted a dual-signature account, on which

---

[2] At a pretrial hearing, Sanchez maintained that once all expenses were paid, ADS was to receive thirty percent of the profits "off the top . . . for being at risk and taking all the liability and responsibility for the job," and that the remaining profits were then to "be split 70/30."

neither individual could unilaterally write a check without the other's signature.

The new Oritani account was opened under the name "ADS Associates Group Inc.," with ADS's tax identification number. The blank checks provided by Oritani included the notation "two signature lines required," with spaces for both Allen and Sanchez to sign each check. Allen and Sanchez were listed as the authorized signatories on the account's signature cards.

Allen testified that during the initial meeting with Fabregas, at the suggestion of Sanchez, he was given the title of Treasurer of ADS. On an Oritani form, Sanchez, acting as ADS's Secretary, formalized Allen's appointment as ADS Treasurer in a corporate resolution dated October 2, 2003. The resolution provided that Allen's appointment would remain effective until it was rescinded or modified by ADS. Allen testified that it was his understanding that his role as Treasurer involved approving payments from the account.

Allen and Sanchez, acting on behalf of ADS, and Fabregas, acting on behalf of Oritani, signed the Bank's "Business Checking Account" Agreement (Account Agreement).[3] The Account Agreement provided in part:

---

[3] During his testimony, Allen expressed confusion as to when the parties signed the Account Agreement, but the document bears the date October 4, 2003.

6

> You will receive a monthly statement reflecting all account activity, all charges assessed therewith and the balance of your account, together with canceled checks for the period. In order to preserve your rights, you must examine the statement and report any problem or error with an account statement within 60 days after the statement is sent to you or [Oritani] is not liable for such problem or error. This includes a forged, unauthorized or missing signature or endorsement, a material alteration, a missing or diverted deposit, or any other error or discrepancy.

The Account Agreement further provided that ADS would be "liable for any losses or expenses caused by [ADS's] employees, owners, principals or agents who forge or alter any instrument or endorsement or make any unauthorized charge to [ADS's] account."

According to Allen, during the October 2, 2003, meeting, Fabregas explained that only ADS, as the account holder, would receive bank statements, and that Oritani would not separately mail bank statements to Allen. Therefore, Allen and Sanchez determined that it would be Sanchez's responsibility to review the bank statements and to report any errors to Oritani.

In October 2003, when Allen and Sanchez opened the ADS account, Oritani offered its customers internet banking services, accessible to any authorized signatory on an account through a separate electronic banking application. At trial, Marjorie Lois Chup, a manager in Oritani's electronic banking services, testified about Oritani's internet banking policy.

7

She stated that any individual who was an authorized signatory on an account could complete an application to gain access to the internet banking services using a selected code, and could then link the account holder's existing accounts online.[4] The Account Agreement signed by Allen, Sanchez and Fabregas did not set forth any provision, or state any bank policy, regarding the linking of accounts via the internet. The internal Oritani Branch Procedures Manual in effect in 2003 did not expressly address internet transactions, but generally discussed funds transfers between Oritani accounts. It provided that "[a]ll signatures that are required for withdrawal of funds from the 'from' account [must be] present" before a transfer between two Oritani accounts would be authorized.

Using his own funds, Allen made the initial deposit of $750 into the new ADS account, and later wired $28,000 into the account to cover payments to vendors. As Allen conceded in his testimony, all remaining deposits into the new ADS account were made by Sanchez. At a September 10, 2008 pretrial hearing,

---

[4] Branch Manager Rocco Pinto testified that by 2008, when the trial took place, Oritani required each signatory on a dual-signature account to fill out a separate internet banking application, and that in the absence of such an application executed by both parties with signing authority, internet transactions on the account would be considered unauthorized. Pinto, however, was unfamiliar with the internet banking policy that existed in 2003, and did not provide testimony regarding Oritani's internet banking policy during the relevant time.

Sanchez maintained that he deposited between $200,000 and $400,000 of his own money into the account during the course of the project.

According to Allen, between October 2003 and June 2004, he and Sanchez met frequently to sign checks, which were used to pay ADS's vendors and to reimburse Allen and Sanchez for expenses paid using their personal funds. At times, when Allen was difficult to reach, Sanchez would arrange for Allen to pre-sign checks so that Sanchez could use them to pay ADS expenses. Allen testified that Sanchez did not maintain a running balance in ADS's checkbook and conceded that he did not challenge that practice. He testified that on occasion he requested to see bank statements for the account, but maintained that Sanchez, in response to his requests, offered only excuses as to why he could not provide the statements to Allen. With Sanchez handling the bank account and reviewing statements on ADS's behalf, Allen had no direct contact with the bank between the initial meeting on October 2, 2003, and June 15, 2004, when he discovered the internet transactions at issue in this case.

Soon after ADS commenced work on the project, Sanchez, using the Oritani website, linked the new ADS account with two other preexisting ADS accounts that were approved for internet banking. According to Sanchez, he linked the three accounts because Allen's unavailability made it difficult to pay expenses

9

incurred in the Bergen-Hudson Light Rail project. Between October 15, 2003, and June 14, 2004, Sanchez made eighty-five transfers, totaling $613,972.26, from the dual-signature account to the two other ADS accounts that he had previously established on ADS's behalf. He made six transfers, totaling $61,400, from ADS's two other accounts to the dual-signature account. At trial, Allen denied ever authorizing internet banking on the ADS account or having contemporaneous knowledge of these transfers.

According to Allen, on June 15, 2004, he discovered that Sanchez had made internet transfers of money from the dual-signature ADS account. That day, a check from the dual-signature account in the amount of $70,000, written to a company that Allen owned with his wife, failed to clear due to insufficient funds. Allen testified that, later that morning, a distraught Sanchez visited him and told him that "[t]here's no more money" in the account and that he had "used it for expenses."

Allen immediately went to the Union City Oritani branch, seeking information about the account. After an Oritani employee refused to provide him with bank statements for the account, Allen spoke directly with branch manager Rocco Pinto. Pinto testified that Allen's request to see statements for the dual-signature account was declined because Sanchez was not present to co-authorize the request. Allen testified, however,

10

that Pinto gave him records of transactions on the ADS account conducted during the previous five months. Later, Allen's wife obtained statements from Oritani covering the first three months of the account's existence.

Notwithstanding these developments, Allen continued to work with Sanchez on the Bergen-Hudson Light Rail project for nearly a year. Sanchez made no further internet transfers of funds from or to ADS's dual-signature account, and discontinued his participation in his business venture with Allen in April 2005. After Sanchez ceased working on the project, Allen continued to transact business for the project under the ADS name. Allen testified that he did not file criminal charges against Sanchez.

At trial, Sanchez refuted the suggestion that he stole money from ADS's account. He testified that the Bergen-Hudson Light Rail contract was unprofitable and that, by the conclusion of the project, ADS was subject to numerous liabilities for which he was the personal guarantor. Sanchez stated that as a result of these remaining liabilities, he was forced to file for bankruptcy. According to Sanchez, ADS suffered no damages due to Oritani's conduct.

## II.

On May 17, 2006, Allen filed this action in the Law Division, naming Oritani and Sanchez as defendants. After an initial period of discovery, Oritani moved for summary judgment

11

to dismiss Allen's complaint against it. Allen cross-moved for summary judgment and to amend the complaint to include ADS "as a [p]laintiff by and through its treasurer Brendan Allen." The trial court granted Oritani's motion and dismissed Allen's individual claims. However, it entered orders designating ADS as a plaintiff in this matter and stated that "nothing herein prevents [ADS] from asserting a corporate claim against Oritani."

Oritani then filed a second motion for summary judgment seeking to dismiss the claims asserted by Allen on behalf of ADS. Allen's counsel filed a cross-motion for partial summary judgment on behalf of a plaintiff designated as "ADS Associates Group, Inc. formerly Brendan Allen" seeking a declaration that $613,972 represented "an amount not authorized and not effective as the order of the customer or not enforceable against the customer with such declaration subject to [d]efendant's defenses." The trial court denied Oritani's summary judgment motion, denied ADS's cross-motion for partial summary judgment, directed ADS to file an amended complaint naming itself as the plaintiff, and ordered further discovery.

Allen then filed an amended complaint in his own name as well in the name of ADS. ADS and Allen asserted claims against Oritani for breach of contract, conversion, violation of various UCC provisions, general liability, negligence, gross negligence,

12

breach of fiduciary duty and good faith, violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, and common law fraud.[5] In its answer to the amended complaint, Oritani asserted counterclaims against Allen and ADS alleging, among other claims, that Allen fraudulently asserted a cause of action on ADS's behalf without authorization in violation of New Jersey's Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1. Oritani also asserted cross-claims against Sanchez.[6]

Prior to trial, at the request of Oritani's counsel, Sanchez signed a resolution on behalf of ADS. The resolution stated that Allen lacked authorization to file suit or "otherwise take action on behalf of ADS," that Allen's counsel was not authorized to represent ADS, and that ADS had no cause of action against Oritani or Sanchez. Notwithstanding the terms of the resolution, the trial court denied Oritani's third motion for summary judgment and entered an order authorizing Allen to prosecute claims against Oritani on ADS's behalf.

---

[5] In addition to their claims against Oritani, ADS and Allen asserted claims for breach of contract, conversion, misrepresentation and fraud, and breach of fiduciary duty against Sanchez in the amended complaint. The amended complaint notes that all claims against Sanchez had been stayed pending bankruptcy proceedings.

[6] Oritani's answer to the amended complaint notes that the bank's cross-claims against Sanchez had been stayed as a result of his bankruptcy.

With trial imminent, the trial court conducted a hearing pursuant to N.J.R.E. 104(a).  During the course of that hearing, the trial court determined that Allen had standing to bring suit on behalf of ADS by virtue of the fact that he had a fiduciary duty to ADS as one of its officers.  However, the court determined that Allen could not assert claims against Oritani on his own behalf.

The case was tried before a jury.  Following the close of all evidence but before the case was submitted to the jury, the court considered the parties' motions to dismiss brought pursuant to Rules 4:37-2(b) and 4:40-1.  At a subsequent hearing, the trial court dismissed all the claims brought by Allen on behalf of ADS except for the claim premised on Oritani's alleged violations of UCC Article 4A.[7]  In dismissing the negligence claim, the trial court reasoned that "because the internet transfers are covered by Article 4A any negligence or gross negligence claim based upon them is preempted by Article

---

[7] At the end of ADS's and Allen's proofs, Oritani moved to dismiss plaintiffs' claims, including the negligence and gross negligence claims, pursuant to Rule 4:37-2(b).  At the close of all evidence, the parties disputed whether Oritani could also move for judgment pursuant to Rule 4:40-1.  The trial court found that nothing in Rule 4:40-1 barred Oritani from making such a motion.  The trial court evidently applied the standards of both Rule 4:37-2(b) and Rule 4:40-1 in denying Oritani's motion to dismiss the UCC claims served by ADS and Allen, and dismissed ADS's and Allen's negligence claims pursuant to Rule 4:37-2(b).

14

4A." The court also dismissed all counterclaims asserted by Oritani against plaintiffs except for the counterclaim alleging that plaintiffs violated the Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1. Plaintiffs' sole remaining claim -- for Oritani's alleged violation of UCC Article 4A -- was submitted to the jury.

The jury returned a verdict in favor of ADS. It found that none of the internet transfers initiated by Sanchez between October 15, 2003, and June 14, 2004 had been authorized by ADS, and that ADS had objected to these transfers within one year of the date upon which it received notice of them. The jury awarded damages to ADS in the amount of $295,500. When the trial court inquired how the jury arrived at this figure, the jury responded that it represented the total amount of internet transfers from ADS's new Oritani account between April 2, 2004, and June 14, 2004. The jury explained that this was "representative [of] 60 days from the date of notification."[8]

---

[8] On October 21, 2008, ADS filed a motion for additur, by which it sought to increase the jury's verdict by $318,472.26. ADS also sought an award of interest, attorneys' fees and expenses, and an entry of final judgment. ADS subsequently withdrew its motion for additur, but did not withdraw its motions for interest, attorneys' fees and expenses, and an entry of final judgment. On November 14, 2008, ADS moved for a judgment notwithstanding the verdict, seeking to increase the amount of the judgment to $613,972.26 and incorporating its prior motions for interest and attorneys' fees. The trial court ultimately denied the motions.

On October 28, 2008, Oritani moved pursuant to Rule 4:40-2 for a judgment notwithstanding the verdict. The trial court granted Oritani's motion and dismissed ADS's UCC claim with prejudice. It reasoned that the Account Agreement required ADS to indemnify Oritani for losses and expenses caused by Sanchez, who was a corporate officer when he transferred the disputed funds.

ADS and Allen appealed the trial court's judgment.[9] The Appellate Division reversed the trial court's determination. It ruled that in the wake of ADS's resolution divesting Allen of the authority to litigate on its behalf, Allen no longer had the right to pursue ADS's corporate claims against Oritani.

The panel, however, reasoned that although Allen was not Oritani's customer, he could pursue common law claims on his own behalf against Oritani. The panel recognized a special relationship between Allen and Oritani within the meaning of this Court's decision in City Check Cashing, supra, 166 N.J. at 59-62. In support of its finding of a "special relationship," the panel cited Allen's insistence on a dual-signature checking account in his October 2, 2003, meeting with Oritani's representative and Sanchez, Oritani's knowledge of ADS's two

---

[9] Oritani filed a cross-appeal from the denial of its motion for attorneys' fees and costs. The issues raised in the cross-appeal are not before this Court.

16

preexisting accounts, trial testimony about Oritani's internet policies, and the jury's finding that Sanchez's internet transfers were unauthorized by ADS. The panel reasoned that Oritani had a duty to disclose to Allen that the bank's internet banking policy would allow Sanchez to move funds between ADS accounts under his control. It reversed the trial court's order dismissing Allen's individual common law negligence claims and remanded for a new trial.

We granted certification, limited to the issue of whether Allen may maintain a common law non-customer negligence claim against Oritani. 210 N.J. 260 (2012).

                              III.

Oritani argues that the Appellate Division misapplied this Court's decision in City Check Cashing, and that the panel granted broader rights to Allen, a non-customer, than the rights accorded to customers. It contests the panel's conclusion that Allen and Oritani had a "special relationship," arguing that Allen established contact with Oritani only through ADS. Oritani contends that Allen's claims are governed by Article 4A of the UCC, which precludes Allen from asserting a common law negligence claim. In the alternative, Oritani argues that New Jersey case law provides that banks have no duty to monitor or supervise the account activity of their depositors. Finally, Oritani argues that the record is devoid of evidence that would

17

support a negligence claim because the parties never discussed internet transfers when Allen and Sanchez met with Oritani representatives to set up the account for ADS, and all parties were aware of ADS's existing accounts at Oritani.

ADS and Allen maintain that the Appellate Division appropriately reinstated Allen's common law negligence claims because Allen established a special relationship with Oritani, as recognized by this Court in City Check Cashing. They contend that this special relationship derived from Oritani's representations to Allen, particularly its assurance that the account would require two signatures on each check in order for a withdrawal to be effected. They urge the Court to affirm the Appellate Division's determination.

IV.

We review the trial court's grant of Oritani's motions for involuntary dismissal of Allen's negligence claim, filed pursuant to Rule 4:37-2(b). A motion for involuntary dismissal is premised "on the ground that upon the facts and upon the law the plaintiff has shown no right to relief." R. 4:37-2(b). The "motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). If the court, "'accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of

18

all inferences which can reasonably and legitimately be deduced therefrom,'" finds that "'reasonable minds could differ,'" then "'the motion must be denied.'"  Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)).  An appellate court applies the same standard when it reviews a trial court's grant or denial of a Rule 4:37-2(b) motion for involuntary dismissal.  Fox v. Millman, 210 N.J. 401, 428 (2012).

We review the trial court's interpretation of Article 4A and all other legal determinations by the trial court de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

A.

At the outset, we address the impact of UCC Article 4A on Allen's individual claim.[10]  We interpret Article 4A in accordance with the Legislature's direction that the UCC

> shall be liberally construed and applied to promote its underlying purposes and policies, which are:

---

[10] Contrary to the suggestion of the dissent, post at ___ (slip op. at 6), we do not exceed the scope of our grant of certification, but analyze the principles of Article 4A, N.J.S.A. 12A:4A-101 to -507, as applied to this case in order to determine whether Allen can maintain a common law non-customer claim against Oritani.

19

(1) to simplify, clarify, and modernize the law governing commercial transactions;

(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and

(3) to make uniform the law among the various jurisdictions.

[N.J.S.A. 12A:1-103(a).]

UCC Article 4A was enacted by the Legislature in 1994 to address the subject of electronic funds transfers. N.J.S.A. 12A:4A-104(1) broadly defines "[f]unds transfer" to mean "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." A bank customer's transfer of money between two of its own accounts may constitute a "funds transfer" governed by Article 4A of the UCC. See N.J.S.A. 12A:4A-104 cmt. 1 (noting that in some funds transfers within UCC definition, "the originator and the beneficiary may be the same person . . . for example, when a corporation orders a bank to transfer funds from an account of the corporation in that bank to another account of the corporation in that bank"). Sanchez's internet transfers from the dual-signature ADS account that he established with Allen at Oritani to his other ADS accounts at Oritani clearly constitute "funds transfers" within the meaning of Article 4A.

Accordingly, UCC Article 4A provides the statutory framework that governs the transactions at issue in this case.

Article 4A addresses in detail the circumstances under which a bank may conclude that a payment order for a transfer of funds is properly authorized. It provides that "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency." N.J.S.A. 12A:4A-202(1). Article 4A defines the customer's rights, and limits the liability of the bank, when it accepts a payment order that turns out to be unauthorized. N.J.S.A. 12A:4A-202(2) provides:

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.
>
> [N.J.S.A. 12A:4A-202(2).]

"The effect of [N.J.S.A. 12A:4A-202(2)] is to place the risk of loss on the customer if an unauthorized payment order is

21

accepted by the receiving bank after verification by the bank in compliance with a commercially reasonable security procedure." N.J.S.A. 12A:4A-203 cmt. 5.

A second provision, N.J.S.A. 12A:4A-203, protects the customer from the loss of funds under specified conditions:

> The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like.
>
> [N.J.S.A. 12A:4A-203(1)(b).]

That provision allows the customer to "avoid the loss resulting from . . . a payment order if the customer can prove that the fraud was not committed by a person described in that subsection." N.J.S.A. 12A:4A-203 cmt. 5.

A third provision of Article 4A, N.J.S.A. 12A:4A-204, defines the circumstances under which a customer may be awarded a refund of funds found to have been transferred without authorization. That provision

> applies only to cases in which (i) no commercially reasonable security procedure is

22

in effect, (ii) the bank did not comply with a commercially reasonable security procedure that was in effect, (iii) the sender can prove, pursuant to [N.J.S.A.] 4A-203(a)(2), that the culprit did not obtain confidential security information controlled by the customer, or (iv) the bank, pursuant to [N.J.S.A.] 4A-203(a)(1) agreed to take all or part of the loss resulting from an unauthorized payment order.

[N.J.S.A. 12A:4A-204 cmt. 1.][11]

Article 4A thus defines in detail the rights and obligations of banks and their customers in the event that funds are transferred in accordance with a payment order that the customer has not authorized. Throughout the statutory provisions and their official comments, the word "customer" is used to describe the person or entity entitled to pursue a remedy against a bank if the statutory requirements for a cause of action are met. See, e.g., N.J.S.A. 12A:4A-203(1)(b) (stating that a "receiving bank is not entitled to enforce or retain payment of [a] payment order if the customer proves" specified circumstances); N.J.S.A. 12A:4A:203 cmt. 5 (stating that "[t]he customer may avoid the loss resulting from" certain

---

[11] A refund awarded to a customer may include interest on the amount refunded "calculated from the date the bank received payment to the date of the refund." N.J.S.A. 12A:4A-204(1). The amount of interest awarded may, however, be affected by a customer's failure to exercise ordinary care to discover and report the unauthorized payment order. N.J.S.A. 12A:4A-204(1). Moreover, a customer's ability to seek a refund from a receiving bank may be limited by N.J.S.A. 12A:4A-505.

payment orders "if the customer can prove" particular circumstances exist). The term "customer" is specifically defined in the statute as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." N.J.S.A. 12A:4A-105(1)(c).

Here, the definition of a customer does not apply to Allen. The record demonstrates that ADS was the customer, as defined by N.J.S.A. 12A:4A-105(1)(c). ADS, not Allen, executed the Account Agreement dated October 4, 2003. ADS, not Allen, was the account holder for the Oritani account at issue under that Agreement. ADS, not Allen, was the party entitled to receive the bank statements. Although N.J.S.A. 12A:4A-501(1) provides that "the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party," the Account Agreement between ADS and Oritani does not in any respect confer upon Allen the status of a customer for purposes of UCC Article 4A, or otherwise support Allen's right to bring an individual claim against Oritani. Instead, the Account Agreement underscores the status of ADS as Oritani's sole customer for the purposes of the disputed account.

The dissent relies on two cases, Schoenfelder v. Arizona Bank, 796 P.2d 881, 883-84, 889 (Ariz. 1990), and First Nat'l Bank v. Hobbs, 450 S.W.2d 298, 299 (Ark. 1970), for the proposition that Allen should be considered a "customer" of

24

Oritani within the meaning of N.J.S.A. 12A:4A-105(1)(c).  Post at ___ (slip op. at 7-10).  Both Schoenfelder and Hobbs constituted applications of Article 4, not Article 4A, and were decided before Article 4A was adopted by their states' respective legislatures.  See Ariz. Rev. Stat. Ann. §§ 47-4A101 to 47-4A507 (1991); Ark. Acts 1991, No. 540 § 1 (Enacted March 14, 1991).

Article 4 and Article 4A do not define the term "customer" in precisely the same way.  For purposes of Article 4, N.J.S.A. 12A:4-104 defines "customer" to denote "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."  N.J.S.A. 12A:4-104(a)(5).  In contrast, for purposes of Article 4A, N.J.S.A. 2A:4A-105 connects the scope of the term "customer" directly to the payment orders that are the subject of Article 4A, defining the term to mean "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders."  N.J.S.A. 12A:4A-105(1)(c).  Here, Allen clearly did not meet the narrow definition of "customer."  As confirmed by the Account Agreement, the "account holder" was ADS, not Allen, and the record contains no evidence that Oritani ever agreed to receive a payment order from Allen.

Moreover, in neither of the cases cited by the dissent was the plaintiff advised -- as was Allen in this case -- that he

25

was not the account holder, and that he was not entitled to receive bank statements.  See Schoenfelder, supra, 796 P.2d at 888; Hobbs, supra, 450 S.W.2d at 302.  In contrast to the conduct of the defendant banks in Schoenfelder and Hobbs, Oritani never acted in a manner that could have induced Allen to believe that he was its "customer"; indeed, he was expressly told otherwise.  The dissent cannot, and does not, cite a case in which an individual in Allen's position has been deemed to be a "customer" for purposes of Article 4A.

In short, if N.J.S.A. 12A:4A-203 or -204 afforded a remedy under the circumstances of this case, such a remedy would be available only to the "customer."  In this case, the sole customer of Oritani is ADS.[12]

B.

In that setting, in which the Legislature has unequivocally limited claims against banks under N.J.S.A. 12A:4A-203 and -204, we consider whether Allen may assert a common law negligence claim against Oritani.

Prior to this case, no New Jersey appellate court has determined whether a non-customer, who claims damages arising from a funds transfer, may sue a bank under a common law

---

[12] We do not reach the issue of whether ADS could assert a claim against Oritani under Article 4A of the UCC in the circumstances of this case.  Only Allen's individual claims are before the Court.

26

negligence theory independent of Article 4A of the UCC.  In other settings, however, our courts have addressed the availability of common law remedies in commercial disputes.

Notwithstanding its expansive language, "the UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction."  N.J. Bank, N.A. v. Bradford Sec. Operations, Inc., 690 F.2d 339, 345 (3d Cir. 1982).  N.J.S.A. 12A:1-103(b) provides:

> Unless displaced by the particular provisions of the [UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions.
>
> [N.J.S.A. 12A:1-103(b); see also N.J.S.A. 12A:1-103 cmt. 4 (stating that "[t]he list of sources of supplemental law . . . is intended to be merely illustrative . . . and is not exclusive").]

Addressing the UCC provisions that are now codified in New Jersey under N.J.S.A. 12A:1-103, the Third Circuit has stated that "[a]s a general rule, courts have read [the] principles of construction to mean that the [UCC] does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the UCC."  N.J. Bank, supra, 690 F.2d at 345-46; see Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat'l Bank, 390

27

N.J. Super. 199, 204 (App. Div. 2007); Sebastian v. D & S Express, Inc., 61 F. Supp. 2d 386, 391 (D.N.J. 1999).

In City Check Cashing, supra, this Court considered whether a check-cashing service that was not the customer of the defendant bank could assert a common law cause of action against the bank, which allegedly failed to respond to the service's urgent request to authenticate a certified check. 166 N.J. at 52-55. Addressing the framework for check collection and payment set forth in Articles 3 and 4 of the UCC, the Court stated:

> It is against that backdrop, and mindful of the balance of interests reflected in the Legislatures' enactment of the [UCC]'s provisions, that most courts have been reluctant to sanction common law negligence claims. "Only in very rare instances should a court upset the legislative scheme of loss allocation and permit a common law cause of action."
>
> [Id. at 58 (quoting Bank Polska Kasa Opieki, S.A. v. Pamrapo Sav. Bank, S.L.A., 909 F. Supp. 948, 956 (D.N.J. 1995)); see also Girard Bank v. Mount Holly State Bank, 474 F. Supp. 1225, 1239 (D.N.J 1979) (noting that "[c]ourts should be hesitant to improvise new remedies outside the already intricate scheme of Articles 3 and 4").]

Nevertheless, the Court observed "that implicit in those expressions of the need for restraint is a recognition that a common law duty, in fact, may arise and that its breach may be actionable in spite of the existence of the [UCC]." City Check

28

Cashing, supra, 166 N.J. at 58-59 (citing Girard Bank, supra, 474 F. Supp. at 1239). The Court held that "in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC]." Id. at 62.

In City Check Cashing, the Court found no special relationship that would support a common law cause of action arising from the defendant bank's failure to respond to the plaintiff check-cashing service's request to verify the authenticity of an altered certified check, prior to a midnight deadline imposed by a UCC provision. Id. at 62-63. The Court noted that the check-cashing service was not the bank's customer, that it had no agreement with the bank, and that it had not promised an immediate response to its urgent request. Id. at 63.

In Brunson v. Affinity Federal Credit Union, the Court underscored its holding in City Check Cashing, noting that "in the unique context of whether a bank owes a duty to a non-customer, it is clear that '[a]bsent a special relationship, courts will typically bar claims of non-customers against banks.'" 199 N.J. 381, 400 (2009) (alteration in original) (quoting City Check Cashing, supra, 166 N.J. at 60); see also Psak, Graziano, Piasecki & Whitelaw, supra, 390 N.J. Super. at

29

204 (holding that "the UCC displaces the common law where reliance on the common law would thwart the purposes of the UCC").

In that analytical framework, we consider whether a claim by Allen against Oritani premised upon common law negligence would contravene the provisions of UCC Article 4A. In that inquiry, we find substantial guidance in the official comments to Article 4A, which are promulgated on behalf of the National Conference of Commissioners on Uniform State Law and the American Law Institute.[13]

The Official Comment to N.J.S.A. 12A:4A-102 states that Article 4A was intended to prescribe detailed requirements for funds transfers so that parties affected by such transfers may comply with those requirements and anticipate the risks assumed:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting

---

[13] The UCC Article 4A Prefatory Note of National Conference of Commissioners on Uniform State Laws and the American Law Institute states that the "[c]omments that follow each of the sections of [Article 4A] are intended as official comments. They explain in detail the purpose and meaning of the various sections and the policy considerations on which they are based."

of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately.

[N.J.S.A. 12A:4A-102 cmt. 1.]

That Official Comment further provides that Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers:

Funds transfers involve competing interests -- those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

[N.J.S.A. 12A:4A-102 cmt. 1.]

Accordingly, with respect to the categories of transactions within its reach, UCC Article 4A was intended to define the rights and obligations of the affected parties, and set forth the remedy for the breach of a duty.

In light of this expression of legislative intent, we consider the impact of Article 4A on Allen's common law

31

negligence claim, premised on his contention that Oritani was negligent when it permitted Sanchez to transfer funds among ADS's three accounts at Oritani. The dispute in this case arises from a setting directly addressed by Article 4A -- a bank's acceptance of an order transferring funds from one account held by its customer to another of that customer's accounts. Therefore, this matter is among the disputes for which the Legislature intended Article 4A to constitute "the exclusive means of determining the rights, duties and liabilities of the affected parties." Ibid. Moreover, our recognition of the common law negligence action asserted by Allen in his individual capacity would contravene the essential objective of Article 4A: to provide definitive principles that allocate the risks and define the duties of banks effecting electronic transfers on behalf of their customers. Ibid.

As shown by the definition of customer in N.J.S.A. 12A:4A-105(1)(c), and the plain language of N.J.S.A. 12A:4A-202, -203 and -204, the Legislature clearly intended to impose upon banks specified duties to customers. Article 4A recognizes a cause of action against a bank for unauthorized transfers that may only be asserted by a customer. That statutory claim is not afforded to individual officers, directors, or employees of that customer. If Allen were permitted to assert a common law negligence claim against Oritani, the "careful and delicate

32

balancing" of competing interests that generated Article 4A would be undermined. <u>N.J.S.A.</u> 12A:4A-102 cmt. 1.[14] Indeed, were we to permit a corporate officer to assert such a common law claim, the result might be to grant broader rights to non-customers than those afforded to customers in some settings, for instance where a customer has a viable Article 4A claim that is limited by the terms of the customer's agreement with the bank. The recognition of a common law negligence claim -- in this case premised upon a special relationship such as that contemplated in <u>City Check Cashing</u> in the different setting of Articles 3 and 4 -- would be precisely the type of "resort to principles of law or equity outside of Article 4A" that the Legislature expressly sought to avoid. <u>N.J.S.A.</u> 12A:4A-102 cmt. 1.

Our dissenting colleague contends that Allen should be permitted to maintain a "non-customer" claim under <u>City Check Cashing</u> for negligent misrepresentation, independent of Article 4A, based upon Oritani's assurance that two signatures would be

---

[14] Two reported cases from other jurisdictions that addressed this issue in settings governed by Article 4A have barred the common law claims asserted. <u>See</u> <u>Corfan Banco Asuncion Paraguay v. Ocean Bank</u>, 715 <u>So.</u> 2d 967, 968, 970-71 (Fla. Dist. Ct. App.) (barring plaintiff's negligence claim premised on allegation that bank incorrectly accepted transfer despite incorrect account number because UCC Article 4A provided exclusive remedy), <u>rev. dismissed</u>, 728 <u>So.</u> 2d 203 (Fla. 1998); <u>Aleo Int'l, Ltd. v. Citibank, N.A.</u>, 612 <u>N.Y.S.</u>2d 540, 541 (N.Y. Sup. Ct. 1994) (dismissing negligence claim for failure to cancel transfer, in light of UCC Article 4A provisions that governed cancellation and Comment to UCC 4-A-102).

33

required for a check to be honored without disclosing the fact that transfers among ADS's accounts could be effected by means of internet banking.  Post at ___ (slip op. at 13-14). In his amended complaint, Allen did not plead a negligent misrepresentation claim as a non-customer of Oritani -- indeed, he asserted no negligent misrepresentation claim of any kind. As his counsel stated to the trial court, Allen's "City Check Cashing claim," in which he asserted that "there is a special relationship" with Oritani, was pled in Count Four of his amended complaint.[15]  In Count Four, designated "General Liability, Negligence and Gross Negligence – Oritani," Allen generally asserted a claim for negligence and gross negligence against Oritani, premised upon Oritani's alleged failure to

---

[15] Arguing that Count Four should be construed as a claim for negligent misrepresentation, our dissenting colleague does not rely on the negligence claim in Count Four itself, but on allegations of fraud and misrepresentation.  Post at ___ (slip op. at 4-6).  In Count Six, ADS and Allen asserted a claim for common-law fraud, premised upon ADS's status as Oritani's customer, and alleged the elements of that claim, including affirmative misrepresentations and reliance.  In addition, ADS and Allen asserted a misrepresentation claim against Sanchez in Count Nine.  Allen identified only the negligence claim of Count Four -- not the fraud claim set forth in Count Six or the misrepresentation claim alleged in Count Nine -- as his individual claim against Oritani premised upon City Check Cashing.  In that claim -- the sole non-customer claim asserted in this case -- Allen alleges the elements of negligence, but made no attempt to plead a cause of action for negligent misrepresentation.  Accordingly, the dissent postulates a City Check Cashing non-customer claim for negligent misrepresentation that was never asserted in this case.

34

enforce its dual signature policy, permitting the disputed transfers to occur. That claim includes the elements of negligence, but does not state the elements of a cause of action for negligent misrepresentation, which must be pled with particularity in accordance with Rule 4:5-8. Accordingly, the negligent misrepresentation claim that our dissenting colleague contends should be permitted under City Check Cashing, supra, is not part of this case.[16]

Moreover, even if the claim described by the dissent had been pled, such a claim would directly contravene the Legislature's stated objectives in enacting Article 4A. As described by the dissent, the negligent misrepresentation claim would be premised upon the contention that because Oritani assured its customer, ADS, that two signatures would be required

---

[16] The cases which our dissenting colleague cites in support of his argument that Article 4A was not intended "to repeal the law of misrepresentation, or allow banks a free hand to deceive the public" involve allegations of fraud and misconduct that are not reflected by the facts of the instant case. See Regions Bank v. Provident Bank, Inc., 345 F.3d 1267, 1275 (11th Cir. 2003) (involving claims "based on the theory that [the defendant] bank accepted funds when it knew or should have known that the funds were fraudulently obtained"); Regions Bank v. Wieder & Mastroianni, P.C., 423 F. Supp. 2d 265 (S.D.N.Y. 2006) (arising from same factual circumstances involving claims of actual fraudulent transfer); Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 661-62 (S.D.N.Y. 2000) (involving claims that defendant Citibank maintained "a secretive department . . . as a tool for wealthy patrons to accomplish secret, untraceable financial transaction without regard to the legality or legitimacy of such transactions," and facilitated efforts of "a reputed international financial terrorist").

in order for a check from its account to be honored, it should not have authorized the electronic funds transfers in dispute. Post at ___ (slip op. at 13-14).  In Article 4A, the Legislature has treated electronic funds transfers as a distinct category of transactions governed by special rules, and has carefully limited the liability of banks to refund money transferred in accordance with a payment order that the customer has not authorized.  See N.J.S.A. 12A:4A-204.  The negligent misrepresentation claim postulated by the dissent -- devoid of any allegation that the bank failed to utilize an agreed-upon, commercially reasonable security procedure for the electronic transfer -- would seek a remedy outside of the statutory parameters.  Ibid.

In short, a decision authorizing Allen to assert a negligence claim in the setting of this case, in which he clearly lacks the status of a customer, would contravene the purpose and the terms of Article 4A.  Accordingly, the trial court properly dismissed ADS and Allen's common law negligence claim.

### C.

Even if Article 4A's language and intent did not itself bar a negligence claim, no duty of care premised upon a "special relationship," as contemplated in City Check Cashing, could be found in the circumstances of this case.  As this Court has

36

noted, the determination of a duty "'involves identifying, weighing, and balancing several factors -- the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Brunson, supra, 199 N.J. at 403 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)). The duty of care recognized in City Check Cashing, supra, must be premised on a special relationship derived from the parties' "agreement, undertaking or contact." 166 N.J. at 62.

None of those sources of a special relationship can be found in this case. As defined in City Check Cashing, "[a]n agreement is essentially a meeting of the minds between two or more parties on a given proposition." Ibid. (citing Black's Law Dictionary 44 (6th ed. 1991)). "An undertaking is the willing assumption of an obligation by one party with respect to another or a pledge to take or refrain from taking particular action." Ibid. (citing Black's Law Dictionary 1060 (6th ed. 1991)).

Here, Oritani had no direct contract with, or undertaking for the benefit of, Allen as an individual. The Account Agreement provided that ADS was the account holder and thus the bank's customer, that ADS held the title to the "Business Checking Account" maintained by Oritani, and that Oritani had an obligation to send statements only to ADS. Nothing in the Account Agreement remotely suggests a duty on the part of

37

Oritani to detect potentially fraudulent conduct by Sanchez and to report it to Allen.  See Globe Motor Car v. First Fidelity, 273 N.J. Super. 388, 395 (Law Div. 1993) (noting that "[a]bsent a contractual duty, a bank has no obligation to manage, supervise, control or monitor the financial activity of its debtor-depositor and is not liable to its depositor in negligence for failing to uncover a major theft").

To the contrary, the Account Agreement required ADS to "examine the [monthly statement issued by Oritani] and report any problem or error with an account statement within 60 days after the statement is sent to [ADS]."  Failure to do so meant that Oritani would "not [be] liable for such problem or error." There was no "undertaking" on the part of Oritani to constrain Sanchez's ability to transfer funds among the multiple accounts held by ADS at the bank.  Further, if Oritani had any obligation to disclose its internet banking policy, that obligation was to share that policy with ADS, not with Allen in his individual capacity.

Moreover, the record does not indicate that Oritani misled Allen to believe that he held the status of a customer. Instead, it establishes that Oritani clearly informed Allen that his status as a signatory did not make him a customer; its representative told Allen that bank statements would be sent to ADS in care of Sanchez, and that no duplicate statements would

38

be sent to him.  Accordingly, no special relationship can be premised upon an agreement or an undertaking in this case.  See City Check Cashing, supra, 166 N.J. at 62.

In City Check Cashing, the Court characterized "contact," comparing it to agreements and undertakings, as "the loosest of the three terms, defined as the 'establishment of communication with someone.'"  Id. at 62 (quoting Webster's Ninth New Collegiate Dictionary 282 (9th ed. 1984)).  Allen's "contact" with Oritani was limited to two visits:  Allen's October 2, 2003, meeting with Fabregas and Sanchez to open the dual-signature ADS account, and Allen's June 15, 2004, visit to the bank after he learned of Sanchez's transfers of funds.  The record reveals no contact at all between Allen and Oritani during the period in which Sanchez conducted the disputed transfers, much less a communication that would have alerted Oritani to monitor ADS's account activity.  Indeed, despite ADS's contractual obligation to alert Oritani to any problem or error reflected in a bank statement within sixty days of the issuance of that statement, Oritani received no communication from ADS, Allen or Sanchez regarding any such concern.  Thus, there was no contact between Allen and Oritani that would support a finding of a special relationship in this case.  Even if Allen's claim were not barred by Article 4A of the UCC, no

39

such special relationship could be recognized based on the record in this case.[17]

In sum, UCC Article 4A was enacted to comprehensively define the rights and remedies of parties affected by the funds transfers governed by the statute's terms. The plain language of N.J.S.A. 12A:4A-105(1)(c) makes clear that Allen is not a customer entitled to assert a claim against Oritani. Allen's assertion of a common law negligence claim in this case, premised on a special relationship such as that contemplated by this Court in City Check Cashing, contravenes the language and purpose of Article 4A. Accordingly, the trial court properly dismissed Allen's negligence claim.[18]

V.

---

[17] In contending that we "consign[] into irrelevance" City Check Cashing, our dissenting colleague misreads our opinion. City Check Cashing was decided in the very different context of an Article 4 claim. In the Article 4 setting, the common law claims contemplated by City Check Cashing are not subject to the limitations that apply in fund transfer cases governed by Article 4A. The viability of City Check Cashing is unaffected by this opinion, which addresses claims arising from funds transfers regulated by N.J.S.A. 12A:4A-101 to -507.

[18] The trial court's entry of judgment notwithstanding the verdict in favor of Oritani, following the dismissal of Allen's individual claims, was premised upon ADS's obligation to indemnify Oritani for any losses and expenses caused by Sanchez. Because the Appellate Division's determination that Allen had no authority to assert claims on ADS's behalf is not under review, ADS has no judgment against Oritani, and the issue of indemnification is moot.

The determination of the Appellate Division panel is reversed, and the judgment of the trial court is reinstated.

     CHIEF JUSTICE RABNER; JUSICES LaVECCHIA and FERNANDEZ-VINA; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion.

ADS ASSOCIATES GROUP, INC.,
and BRENDAN ALLEN,

    Plaintiffs-Respondents,

       v.

ORITANI SAVINGS BANK,

    Defendant-Appellant,

       and

ASNEL DIAZ SANCHEZ,

    Defendant.


    JUSTICE ALBIN, dissenting.


    Today, the majority announces that a bank can make material misrepresentations to a party, facilitate the fleecing of the party by his partner, and yet have no accountability and face no liability.  The majority comes to that fundamentally unjust result by a crabbed reading of the Uniform Commercial Code (UCC), by ignoring UCC jurisprudence, and by consigning to irrelevance one of our recent precedents, City Check Cashing Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 62 (2001), which allows for common-law causes of action against banks for negligent misrepresentation.  I do not believe that the UCC or

the common law immunizes a bank from liability when it violates established norms of commercial conduct. I therefore respectfully dissent.

## I.

## A.

Plaintiff Brendan Allen brought suit against defendant Oritani Savings Bank for common-law negligence and fraud and for violations of the UCC, N.J.S.A. 12A:4A-204, and the Consumer Fraud Act, N.J.S.A. 56:8-1 to -2.13. I need not repeat the complex and convoluted procedural history, which the majority has ably described. I will focus only on the issue before the Court.

The trial court granted summary judgment in favor of Oritani on Allen's negligence claim, and the Appellate Division reversed. We granted certification "limited to the issue whether [Allen] can maintain a common law non-customer negligence claim against the bank." 210 N.J. 260 (2012).

Whether Oritani is entitled to summary judgment on Allen's negligence claim requires that we view the summary-judgment record in the light most favorable to Allen, the non-moving party. With that standard in mind, here are the relevant facts.

## B.

2

Allen and Asnel Diaz Sanchez agreed to pursue a joint business venture through an existing corporation, ADS Associates Group, Inc., of which Sanchez was the sole stockholder.  In October 2003, Allen and Sanchez visited Oritani Savings Bank with the purpose of opening a joint business account.  Allen explained to Oritani's branch manager, Marlene Fabrigas, that he wanted a joint account so that no funds could be removed from the account without his written consent.  He also explained that this safeguard was to protect his business investment.  Fabrigas told Allen that only one person or entity could be listed as the account holder.  She assured Allen, however, that the account would be established in a way so that no monies could be removed without his consent.

Using a bank form, Fabrigas prepared a corporate resolution -- for Sanchez's signature -- that designated Allen as treasurer of ADS Associates.  Fabrigas also completed a "Business Account Signature Card" that required the signatures of both Allen and Sanchez "in the payment of funds or in the transaction of any business for this account."  In other words, by agreement, Oritani was not authorized to permit any transaction from the new account without Allen's written consent, including a transfer of funds from the account.  In accordance with that arrangement, Fabrigas had checks printed with two signature lines, one for Allen and one for Sanchez.  Based on Fabrigas's

3

representations, Allen placed $28,750 of his personal funds into the bank account.

Less than two weeks later, unbeknownst to Allen, the bank allowed Sanchez, on his own, to begin making Internet transfers out of the ADS account until it was bled dry. Fabrigas never hinted to Allen that the bank made an exception to the two-signature rule with Internet transfers. Allen only became aware of the transfers when a check issued on the account bounced.

## II.

The majority contends that Allen's general claim of negligence is not supported by allegations that Oritani made misrepresentations in violating its duty of due care. A fair reading of the complaint says otherwise.

In Count Four of the complaint, titled "General Liability, Negligence, and Gross Negligence," Allen asserted that "Oritani had a duty to Allen based upon the promises made directly by the branch manager and representations [she] made." Accordingly, Oritani had "a duty to reasonably and diligently enforce the dual signature security provisions contracted for with regard to the ADS account." In support of that claim, Allen specifically alleged the misrepresentations -- the promises -- made by the bank manager:

4

[Paragraph] 11. The manager assured ALLEN several times during the filling out of the paperwork that there was no way [SANCHEZ] could remove any money from the account without Allen's consent.

[Pararaph] 12. The manager did this with full knowledge that Defendant ORITANI could not live up to this promise.

[Paragraph] 18. Oritani assured ALLEN each and every time requested to send statements that it did not matter because there was no way that money could be removed from the account without ALLEN's signature on a check.

[Paragraph] 19. Oritani knew that representation to be false at the time it was made.

[Paragraph] 45. This method of security requiring both signatures was purposely undertaken to prevent either holder from obtaining funds from the ADS account without the express and written consent of BOTH ALLEN and SANCHEZ which consent was to be evidenced by both parties' signatures being submitted to ORITANI before any funds could be accessed or disbursed on behalf of ADS.

[Paragraph] 50. In fact, ORITANI made affirmative misrepresentations to both ADS and ALLEN in connection with the opening up and creation of the ADS account by representing to all parties that the dual signature requirement would be strictly and

5

reasonably enforced diligently, with regard
to each and every transaction.[1]

The majority's strained parsing of the complaint does not obscure what is self-evident -- that Allen's negligence claim is premised, in part, on the repeated misrepresentations made by the bank manager.  Those misrepresentations are particularized in accordance with Rule 4:5-8.  Oritani was on notice of a negligent-misrepresentation cause of action, consistent with the pleading practices in this state.  See Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (holding that under our liberal notice-pleading standards, "a reviewing court searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary" (citation and internal quotation marks omitted)).  That Allen's negligence claim is based partly on Oritani's misrepresentations is not undermined by Allen's claims alleging fraud and misrepresentation and consumer fraud in other counts.

Allen's cross-petition for certification, moreover, made clear that the non-customer negligence claim rested on Oritani's

---

[1] These paragraphs were all incorporated into Count Four of the complaint.

6

misrepresentations. In the cross-petition, which we granted, Allen stated that "there was clearly a special relationship between Oritani and Allen. . . . Oritani made representations to [Allen] which [Allen] relied upon to [his] detriment, i.e.[,] that Oritani would treat this as a two signature account for [Allen's] protection, which misrepresentations were breached." On this basis, Allen claimed he could "maintain a negligence cause of action." Significantly, Oritani did not challenge Allen's characterization that his negligence claim was premised on the bank's misrepresentations. The majority raises this objection on its own.

In short, Allen fairly pled a cause of action for negligence based on misrepresentations made by the bank. The record does not allow that fact to be willed away. I now turn to the substantive issues before the Court.

III.

Although the Court granted certification solely to resolve "whether [Allen] can maintain a common law non-customer negligence claim against Oritani," 210 N.J. 260, the majority also resolves an issue on which the Court denied certification -- whether Allen was a bank customer able to pursue a UCC claim under N.J.S.A. 12A:4A-204. That issue -- technically not before us -- the majority wrongly decides. I now believe that we erred

7

in not granting certification on Allen's UCC claim.  Indeed, Allen was correct:  the Appellate Division erroneously affirmed the dismissal of his UCC claim based on the mistaken notion that he was not a customer of Oritani.

The majority concludes that Allen has no UCC claim because ADS Associates -- not Allen -- was Oritani's customer, and that because he was not a customer, he has no common-law negligence claim either.  The majority is wrong on both counts.  First, substantial authority supports the view that Allen was a bank customer for UCC purposes.  Second, contrary to the position taken by the majority, courts have overwhelmingly held that UCC Article 4A does not bar common-law claims and that it is not the exclusive remedy for harms related to funds transfers.  In particular, Article 4A is not the exclusive remedy when a bank induces a person to open and place money in an account based on misrepresentations.  Last, Allen's common-law negligence claim finds support not only in City Check Cashing but also in the Restatement (Second) of Torts (1977), and in cases from this Court and other courts across the country.

IV.

A.

A person "having an account with a bank" is a "customer" for the purposes of Article 4 (bank deposits) and Article 4A

8

(funds transfers). N.J.S.A. 12A:4-104(a)(5); N.J.S.A. 12A:4A-105(1)(c). Although, under Article 4 and Article 4A, a customer is not limited to a person "having an account with a bank," that definition of a customer is common to both Articles.[2] No case suggests that a person "having an account with a bank" could be a customer for Article 4 purposes but not for Article 4A purposes.

The majority contends that Allen was not a bank customer under Article 4A. According to the majority, a person is not a customer unless his name is on the title of the bank account. I would not follow the majority's formalistic definition of "customer," a definition that has been rejected by a number of courts.

Indeed, the Arizona Supreme Court in Schoenfelder v. Arizona Bank, 796 P.2d 881, 889 (Ariz. 1990), held that a person who is a mandatory signatory on an account held by a corporation can stand as a customer in his own right. That case is

_____

[2] Compare N.J.S.A. 12A:4-104(a)(5) ("'Customer' means a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."), with N.J.S.A. 12A:4A-105(1)(c) ("'Customer' means a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders."). Thus, the relevant definitions in both Articles are the same.

strikingly similar to the one before us and refutes the majority's position.

In Schoenfelder, the plaintiff arranged to sell a parcel of land to a corporate developer who intended to finance a construction project with a bank loan. Id. at 884. The plaintiff and the corporate developer opened an account in the developer's name in a bank where the developer had other accounts. Ibid. The plaintiff wanted to ensure that the loan proceeds would be used only on the project. Ibid. To that end, the new account was structured so that the plaintiff's signature would be required for the withdrawal of any funds. Ibid. The corporate account's signature card indicated that the plaintiff's signature and either of two other signatures were necessary for a funds withdrawal. Ibid. The bank paid on checks that bore the plaintiff's forged signature. Ibid. On that basis, the plaintiff sued the bank, seeking relief under Article 4 of the UCC. Id. at 885.

The Arizona Supreme Court concluded that the plaintiff was the bank's "customer" under the UCC. Id. at 889. In reaching that conclusion the Arizona high court took "into account all the material circumstances surrounding the opening of the account, the acknowledged intent of the parties to the transaction, the bank's knowledge of that intent, and the nature

10

of the bank's transactions with the parties." Id. at 886. The Schoenfelder court reasoned that a "fact-intensive analysis" is required and that the focus should not be on "the mere technicalities of the named owner of the account, and the formal organization of that entity." Id. at 887. It also observed that in those cases in which courts held that signatories were not bank customers, the banks did not have "knowledge of a unique arrangement between the plaintiff and the named account owner regarding ownership of the funds." Id. at 886. Accordingly, the plaintiff was entitled to sue the bank for the forged checks. Id. at 889. The plaintiff in Schoenfelder unquestionably would have had a cause of action if the bank had paid on checks where a necessary signature was missing from the signature line.

In another similar case, the Arkansas Supreme Court allowed a cause of action under Article 4 for a bank's failure to enforce a dual-signature requirement, finding Lloyd Hobbs a customer even though the account was not in his name. First Nat'l Bank v. Hobbs, 450 S.W.2d 298, 301-02 (Ark. 1970). In that case, Hobbs owned a motel franchise and contracted with a businessman to lease and operate the motel. Id. at 299. They agreed that all revenues would be deposited into a corporate account at a local bank. Id. at 299-300. They explained their business arrangement to the bank manager, who agreed to open an

11

account that would require two signatures on all checks.  Id. at 300.  Later, the bank allowed money to be withdrawn from the account by check without two authorized signatures.  Ibid.  The Arkansas high court found that, for Article 4 purposes, Hobbs was a customer because he had "opened the account, and directed the manner in which it was to be handled."  Id. at 301.

A number of cases are in accord with Schoenfelder and Hobbs and have rejected the majority's narrow definition of customer.  See, e.g., Murdaugh Volkswagen, Inc. v. First Nat'l Bank, 801 F.2d 719, 725 (4th Cir. 1986) (holding that, despite corporation's name on account, sole stockholder was herself customer and able to bring UCC suit against bank because she personally guaranteed corporation's obligations); Parrett v. Platte Valley State Bank & Trust Co., 459 N.W.2d 371, 379 (Neb. 1990) (holding same for principal shareholder); Kendall Yacht Corp. v. United Cal. Bank, 50 Cal. App. 3d 949, 956 (Ct. App. 1975) (holding same for husband-and-wife-owned corporation).

Schoenfelder and Hobbs, Murdaugh Volkswagen, Parrett and Kendall Yacht Corp. are persuasive in defining when a person is a customer under the UCC.  I would adopt the Schoenfelder totality-of-the-circumstances test for determining when a person is a UCC bank customer.  That test considers "the relationship of the parties to the bank, the purpose of the account, and the

12

bank's knowledge of those facts." Schoenfelder, supra, 796 P.2d at 887. Here, Oritani orchestrated the opening of the account -- requiring Allen's signature for a withdrawal of funds. The purpose of the dual-signature requirement was to prevent Sanchez from emptying the account without Allen's knowledge. Oritani not only misrepresented to Allen that his interest in the account would be protected by the dual-signature requirement, but it also facilitated the fraud by allowing Sanchez to act unilaterally.

Those facts were sufficient to justify bringing this matter before a jury for its ultimate determination.

### B.

As indicated earlier, had this Court not denied certification on Allen's UCC claims, I would have held that Allen was a customer. I would also have held that he survives summary judgment on his UCC claim under N.J.S.A. 12A:4A-204(1), which provides that: "If a receiving bank accepts a payment order issued in the name of its customer as sender which is . . . not authorized . . . the bank shall refund any payment . . . ." (emphasis added). The transfers by Sanchez were not "authorized" because they were expressly forbidden by the agreement (expressed in the Signature Card) that two signatures

13

are required for any transaction.  Thus, Allen's UCC claim should have been allowed to proceed to trial.

I would rectify our mistake in denying certification on the UCC claim even at this late date.  I would grant certification now.  Justice delayed is better than a complete denial of justice.

V.

A.

Concerning the issue on which we granted certification, I would hold that Allen is entitled to proceed to trial on his common-law negligence claims pursuant to City Check Cashing, supra, 166 N.J. at 62.  There, we held that a bank may owe a common-law duty -- not inconsistent with the UCC -- when "the facts establish a special relationship between the parties created by agreement, undertaking or contact."  Here, there was an agreement -- "a meeting of the minds between two or more parties on a given proposition."  See ibid.  The bank, Allen, and Sanchez all agreed that financial transactions on the account required two signatures.  The bank also engaged in an undertaking.  It willingly made "a pledge to take . . . particular action" -- not to release funds without two signatures.  See ibid.  Last, "whether a contact creates a duty is determined by its nature and surrounding circumstances."

14

*Ibid.* The communications made by the bank to Allen surely gave rise to a duty. See *ibid.*

This case falls into all three *City Check Cashing* categories: Oritani entered into an agreement with Allen, undertook to refrain from releasing funds without his signature, and clearly had contact with him. After having told Allen that his signature was required for any funds to be taken from the account, "[Oritani] had a duty to disclose its Internet policy to Allen when [the account] was opened," specifically "the availability and effect of Internet banking, and how it could result in an electronic transfer of funds from the account without two-signature authorization." That is, Oritani had a duty to be truthful with Allen. Certainly, Oritani should not have told Allen that funds could not be released from the account without his written signature when it knew that statement was false concerning Internet funds transfers.

Oritani's misrepresentations are a basis for liability under our tort law. A defendant is liable for negligent misrepresentation when he "supplies false information for the guidance of others in their business transactions, . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Petrillo v. Bachenberg*, 139 *N.J.* 472, 484 (1995) (alteration in original) (quoting

15

Restatement (Second) of Torts, supra, § 552(1)) (holding attorney liable to non-client for negligently omitting negative information from report on which non-client relied in purchasing real property).

The Restatement standard, which we adopted in Petrillo, applies to any statements made to others and is not limited to a defendant's customers or clients. Ibid. Whether or not Allen was a customer, the bank was "liabl[e] for pecuniary loss caused to [Allen] by [his] justifiable reliance upon the [false] information." Restatement (Second) of Torts, supra, § 552(1).

That duty does not imply (as the majority claims) that Oritani had a duty "to detect potentially fraudulent conduct by Sanchez and to report it to Allen," ante at ___ (slip op. at 33). The breach of the bank's duty was complete when the false statements were made at the account opening.

I now turn to address why a cause of action for negligent misrepresentation is not inconsistent with the UCC.

B.

At its core, the majority's rationale is that because Allen "clearly lacks the status of a customer," a negligence cause of action, in addition to those provided in Article 4A, would inherently "contravene" the UCC. Ante at ___ (slip op. at 31).

16

However, "[n]ot all common law claims are per se inconsistent with [Article 4A's] regime." Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 597 F.3d 84, 89 (2d Cir. 2010). It is well-established that "Article 4-A . . . is not the exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer." Sheerbonnet, Ltd. v. Am. Express Bank, Ltd., 951 F. Supp. 403, 409 (S.D.N.Y. 1995).

The UCC's drafters and our Legislature intended that common-law claims would survive -- and indeed supplement -- the UCC unless a UCC provision bars a particular claim. See N.J.S.A. 12A:1-103(b) (providing that "unless displaced by the particular provisions of the [UCC], the principles of law and equity, including . . . fraud [and] misrepresentation . . . supplement its provisions"). The Drafting Committee's comment cited by the majority, U.C.C. 4A-102 official cmt. (1989), cannot undermine the text of the statute.

The majority, moreover, overreads the comment, which states that "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in [that] Article." U.C.C. 4A-102 official cmt. By its own language, the comment provides that a plaintiff may resort to principles of law or equity that are not inconsistent with Article 4A. As Thomas Baxter, the

17

Chair of the Subcommittee on Proposed UCC Article 4A, explained, "the Drafting Committee intended that Article 4A would be supplemented, enhanced, and in some places, superceded by other bodies of law." Thomas C. Baxter, Jr. & Raj Bhala, The Interrelationship of Article 4A with Other Law, 45 Bus. Law. 1485, 1485 (1990). Therefore, "electronic funds transactions are governed not only by Article 4A, but also by common law." 3 James J. White & Robert S. Summers, Uniform Commercial Code § 22-3, at 8 (5th ed. 2008).

Consistent with this point, courts "have held that plaintiffs may turn to common law remedies to seek redress for an alleged harm arising from a funds transfer where Article 4A does not protect against the underlying injury or misconduct alleged." Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 215-16 (1st Cir. 2012) (permitting claims for breach of contract and of fiduciary duty). Those common-law claims include causes of action for negligence, breach of contract, and fraud. See, e.g., Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 797 (2d Cir. 2011) (permitting claim for breach of contract); Regions Bank v. Provident Bank, Inc., 345 F.3d 1267, 1276 (11th Cir. 2003) (permitting claims for conversion and unjust enrichment); Regions Bank v. Wieder & Mastroianni, P.C., 423 F. Supp. 2d 265, 269 (S.D.N.Y. 2006) (permitting claims for conversion and breach of fiduciary duty), remanded for

18

reconsideration on other issue, 253 Fed. Appx. 52 (2d Cir.), aff'd on remand, 526 F. Supp. 2d 411 (S.D.N.Y. 2007); Miller v. Union Planters Bank, N.A., 61 U.C.C. Rep. Serv. 2d (Callaghan) 328, at 10-11 (S.D. Miss. 2006) ("[Plaintiff's] common law claims [for negligence, conversion, breach of contract and of fiduciary duty] are not inconsistent . . . because Article 4A does not expressly prohibit the remedies [he] is seeking."); Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 666 (S.D.N.Y. 2000) (permitting claims for negligence and unjust enrichment); Sheerbonnet, supra, 951 F. Supp. at 412, 414 (permitting claims for conversion, tortious interference with contract, and unjust enrichment); cf. Hanover Ins. Co. v. M&T Bank, 783 F. Supp. 2d 809, 815 (E.D. Va. 2011) ("[UCC § 4-406(f)] does not bar [plaintiff's] breach of contract claim because [plaintiff] is not a 'customer' . . . .").

Indeed, claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward. See Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 224 (4th Cir. 2002) (holding "[plaintiff's] negligence claims, insofar as they challenge the opening and management of [the] account" are not inconsistent with Article 4A); Gilson v. TD Bank, N.A., 73 U.C.C. Rep. Serv. (Callaghan) 2d 430, at 27 (S.D. Fla. 2011) (holding that negligence claim alleging "lack of care during the account openings, not the wire transfers" is not

19

inconsistent with Article 4A, "which governs only wire transfers").

Instead of eliminating common-law causes of action across the board, as the majority does, other courts have recognized that "[t]he exclusivity of Article 4-A is deliberately restricted to 'any situation covered by particular provisions of the Article.'" Sheerbonnet, supra, 951 F. Supp. at 408 (quoting N.Y. U.C.C. 4A-102 official cmt.). Article 4A does not cover misrepresentations that induce a customer to have a relationship with a bank. The provisions of Article 4A "are transactional, aimed essentially at resolving conflicts created by erroneous instruction or execution of payment orders." Id. at 412. In these circumstances, the tort of negligent misrepresentation is not inconsistent with the purpose of Article 4A.

The drafters of Article 4A did not intend to repeal the law of misrepresentation, or allow banks a free hand to deceive the public, so long as a funds transfer is incidentally involved and the bank otherwise complies with Article 4A. See Regions Bank, supra, 345 F.3d at 1276 ("It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with . . . Article 4A."); Regions Bank, supra, 423 F. Supp. 2d at 269 (holding that "a rule established to govern wire transfers would not restrict

20

a party's fiduciary duties," nor sanction conversion); Dubai Islamic Bank, supra, 126 F. Supp. 2d at 666 (accepting plaintiff's argument that "a bank is not immune from common law liability arising from its tortious conduct simply because wire transfers may be involved").

In the related context of Article 4, moreover, courts have repeatedly held that negligent-misrepresentation claims are not displaced by the UCC.  See, e.g., Avanta Fed. Credit Union v. Shupak, 223 P.3d 863, 871 (Mont. 2009) ("[T]he customer who detrimentally relies on the negligent misrepresentations of the bank's agents, and thereby suffers damage, is not without recourse."); Holcomb v. Wells Fargo Bank, N.A., 155 Cal. App. 4th 490, 498 (Ct. App. 2007) ("There is nothing in the [UCC] prohibiting a claim based on a depositor's detrimental reliance on a bank employee's incorrect statements."), appeal denied, No. S157668, 2007 Cal. LEXIS 14459 (Dec. 19, 2007); First Ga. Bank v. Webster, 308 S.E.2d 579, 581 (Ga. Ct. App. 1983) (holding that negligent-misrepresentation action against bank not barred by UCC).

Finally, contrary to the suggestion by the majority, a non-customer cause of action is not precluded just because, in certain instances, the non-customer is accorded broader rights than a customer.  See Hanover Ins. Co. v. M&T Bank, 783 F. Supp.

21

2d 809, 815 (E.D. Va. 2011) (holding that Article 4 statute of repose, UCC § 4-406(f), "does not bar [plaintiff's] breach of contract claim because [plaintiff] is not a 'customer'").

VI.

City Check Cashing envisioned this case. A negligence action premised on a bank's misrepresentations is not in conflict with the UCC and is a basis for liability. Bank deception is not a practice condoned by the UCC or by our common law. The majority has denied Allen his rightful day in court. I therefore respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO. __A-114__                    SEPTEMBER TERM 2011

ON CERTIFICATION TO        Appellate Division, Superior Court
                    _____

ADS ASSOCIATES GROUP, INC.,

and BRENDAN ALLEN,

        Plaintiffs-Respondents,

                v.

ORITANI SAVINGS BANK,

        Defendant-Appellant,

            and

ASNEL DIAZ SANCHEZ,

        Defendant.

DECIDED          September 30, 2014
        _____
            Chief Justice Rabner                    PRESIDING
_____
OPINION BY          Justice Patterson
_____
CONCURRING/DISSENTING OPINIONS BY      _____

DISSENTING OPINION BY      _____    Justice Albin      _____

| CHECKLIST | REVERSE/ REINSTATE | AFFIRM |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | 1 |